IN the MATTER OF DISCIPLINARY PROCEEDINGS AGAINST
Martin R. STEIN, Attorney at Law.

Supreme Court

*No. 91–1825–D. Filed August 11, 1992.*

(Also reported in 486 N.W.2d 526.)

PER CURIAM. *Attorney disciplinary proceeding; attorney's license suspended.*

We review the recommendation of the referee that the court suspend the license of Martin R. Stein to practice law in Wisconsin for one year as discipline for professional misconduct. That misconduct consisted of Attorney Stein's participation in a scheme to obtain money through the lending of a union's pension fund in real estate transactions and, in so doing, engaging in a criminal conspiracy. As Attorney Stein pleaded no contest to the allegations of misconduct set forth in the complaint of the Board of Attorneys Professional Responsibility, we adopt the referee's findings of fact based on those allegations. We also adopt the referee's conclusions of law concerning Attorney Stein's viola-

tions of the rules governing professional conduct of attorneys.

We determine that the one-year license suspension recommended by the referee is insufficient when measured against the seriousness of Attorney Stein's misconduct. On the basis of the ongoing nature of and the substantial amounts of money involved in the scheme in which Attorney Stein participated, the recommended one-year license suspension is disproportionately lenient. We suspend Attorney Stein's license to practice law for two years.

Attorney Stein was admitted to practice law in Wisconsin in 1963 and practices in Milwaukee. He has not previously been the subject of an attorney disciplinary proceeding. The referee is Attorney John R. Decker.

In the summer of 1981, a vice-president of a Milwaukee bank approached Attorney Stein seeking his participation in a scheme to obtain money through the lending of a union's pension funds in real estate transactions. The banker was acquainted with Attorney Stein for many years, beginning when the banker was a lending officer at a predecessor bank, and Attorney Stein had done legal work for the banker from time to time.

The banker told Attorney Stein that the trustees of a union pension fund had committed $10,000,000 to a real estate loan program. Those funds would be available for real estate mortgage loans at an interest rate of 13 percent, approximately 7 percent lower than the then prevailing rate charged for similar loans in the Milwaukee area. The banker knew that Attorney Stein represented a number of clients who participated in real estate developments and who might be interested in borrowing those funds at the low rate.

The banker suggested that Attorney Stein contact some of his clients to see if they wished to apply for a

loan and told him that any person whose loan application was approved would have to pay the banker, immediately and in cash, a commission of three percent of the amount of the loan. The banker told Attorney Stein that he was working with the secretary-treasurer of the pension fund and that the two of them had agreed to split that commission between them. Further, he said that written loan commitments would not be issued unless and until the banker received the cash commission.

Although the banker told Attorney Stein that the pension fund had authorized payment of a three percent finder's fee to its secretary-treasurer and to the banker, Attorney Stein understood that the banker wanted payment in cash to avoid written evidence that could lead to him. The referee found that Attorney Stein knew or should have known that the cash payments were in fact "kickbacks" and that neither the banker's bank nor the pension fund had authorized or was aware of them.

After agreeing to facilitate loans and to transfer the cash payments from the loan applicants to the banker, Attorney Stein contacted several of his clients and others to inform them of the availability of real estate loans at the favorable rate. From September, 1981 through November, 1982, Attorney Stein facilitated seven loans in the aggregate principal amount of $3,063,400, in connection with which he personally gave the banker approximately $92,000 in cash commissions.

The loans facilitated by Attorney Stein were all for real estate projects. In one of those loans, upon examining the loan commitment, Attorney Stein discovered that no interest was required by the lender during the period of construction of the real estate project. Not only was this highly unusual, but it was highly advantageous to the borrower. When he informed the borrowers, who had been referred to him by a long time client, Attorney

Stein proposed that they make him a personal loan of $10,000, without interest and without the loan being evidenced by a note. The $10,000 represented approximately one-third of the amount of interest that would have been payable on the loan from the pension fund had interest been charged during the period of construction. The borrowers and Attorney Stein agreed that if the lender did not revise the loan agreement to require payment of interest during construction, they would not call the loan made to Attorney Stein; if the lender did, Attorney Stein would repay the $10,000 to the borrowers. The lender never sought payment of construction interest.

In connection with another loan, the long time client of Attorney Stein balked at paying the three percent commission in cash because cash payments of that type were not normal in his business. Instead, he gave Attorney Stein a cashier's check payable to Attorney Stein in the amount of $10,272, representing three percent of the loan sought from the pension fund. Attorney Stein took the cashier's check to the banker, who would not let him endorse the check to him but instead escorted Attorney Stein to a teller's window at his bank where he had him cash the check. The two then returned to the banker's office where Attorney Stein handed him the cash in exchange for the loan commitment for his client.

During the late fall of 1981, Attorney Stein was approached by a man who had been introduced to him through a local appraiser of Attorney Stein's acquaintance. The appraiser had already informed the man of the availability of the pension fund loans and the man was in desperate need of a loan to refinance an existing project. The appraiser told Attorney Stein of that situation and suggested they charge the man an additional two percent fee, which they would split equally. The

appraiser apparently had already told the man that a five percent fee in cash was required to obtain the loan, rather than the three percent fee other borrowers had been paying.

Attorney Stein met with the man and told him a five percent "origination fee" was required: $16,500 in cash and two checks each in the amount of $5,500, one payable to Attorney Stein and the other to his trust account. The man gave Attorney Stein $16,500 in currency in a bag at Attorney Stein's office and a check for $5,500 payable to Attorney Stein, which he deposited in his personal bank account and used for his own purposes, and a $5,500 check payable to Attorney Stein's trust account. The latter check was deposited in the trust account and a check was drawn on that account in the same amount made payable to the appraiser.

When the man insisted on a receipt for the $16,500 cash he had given Attorney Stein, the receipt Attorney Stein prepared set forth that one of the requirements in anticipation of the loan was the deposit of the equivalent of five percent of the loan as a loan fee. Attorney Stein knew that the statement was untrue and that the five percent "fee" was never reflected on any loan commitment document or closing statement.

At the time the man entered into the transaction, he was represented by an attorney to whom he described the proposed loan, including the cash requirement. The attorney advised the man not to become involved in the deal but the man was desperate for the loan in order to avoid a potential loss of his one-half interest in the existing project. In order to produce the necessary cash to pay the "loan fee," the man borrowed $20,000 from a bank at 17 percent interest and also depleted his personal savings.

In another of the loan deals, Attorney Stein acted as attorney for the borrower in connection with the loan application. The closing statement he prepared accurately reflected fees collected by the bank but did not disclose the $10,572 cash payment, representing three percent of the face amount of the loan, required by the banker and obtained through Attorney Stein in exchange for the loan commitment.

In another loan transaction, Attorney Stein agreed to participate in the real estate project to be financed and receive a one-third ownership interest. He obtained the three percent fee in cash from the borrowers, as he had done previously with the same borrowers in connection with a similar loan. In addition, without having to make any cash investment, he acquired an equity interest in the project worth approximately $70,000. Attorney Stein testified that he claimed income tax deductions for tax years 1983 through 1990 totaling $160,920 for his participation in that project.

In another loan transaction, the borrower, who had previously obtained a loan from the pension fund under the same circumstances, told Attorney Stein he was unable to raise the cash needed for the three percent fee and asked Attorney Stein to find an investor who would provide the money in exchange for a partial interest in the project to be financed with the loan proceeds. Attorney Stein approached his law partner, proposing that he invest $6,400 in the project in return for a 10 percent interest. He told his partner nothing, however, about his dealings with the banker or the making of a cash payment to obtain the loan commitment. The partner provided the needed cash and together with Attorney Stein became a limited partner in the project. The partnership agreement, which Attorney Stein drafted, showed that Attorney Stein made a cash contribution of $6,400 in

return for his 10 percent interest when in fact he had not contributed any cash to the partnership. Attorney Stein took advantage of tax deductions in this project totaling $7,000 in the tax years 1983 and 1984.

This loan scheme terminated in November, 1982. The banker told Attorney Stein there was no more money available in the pension fund; in reality, the secretary-treasurer, who was the pension fund contact with whom the banker was splitting the cash payments, had been unsuccessful seeking reelection as officer of the pension fund.

The scheme was uncovered in late 1984. Agents of the Federal Bureau of Investigation appeared at the office of Attorney Stein's long time client and asked him questions about the pension fund loans and payments he might have made to obtain those loans. The client called Attorney Stein, who went immediately to his client's office and spoke with the FBI agents. Although he ultimately cooperated with the government in connection with its investigation and provided information and testimony in the prosecutions of the banker and the pension fund officer, Attorney Stein was not fully forthcoming in his initial interviews with the FBI, attempting to conceal the fact that he himself had received a $5,500 payment from one of the borrowers. Moreover, Attorney Stein cooperated with the FBI only after the scheme had been uncovered.

In respect to other mitigating factors, the referee found that, except for his participation in this scheme, Attorney Stein has enjoyed a reputation among the bar and his community as a man of honesty and high integrity. Further, he has devoted much time as a volunteer in legal and nonlegal capacities in a variety of programs for the benefit of his community. The referee also found that the borrowers who had contacted or were contacted

by Attorney Stein and to whom the pension fund loans were made were men of some experience in business transactions and knew or should have known that the required cash payments were to be used as bribes, payoffs, kickbacks or other forms of under-the-table inducement to obtain the loans.

The referee concluded that by his participation in this scheme, Attorney Stein engaged in conduct involving dishonesty, fraud, deceit or misrepresentation, in violation of former SCR 20.04(4) and current SCR 20:8.4(c),[1] for which he recommended a one-year license suspension as a disciplinary sanction.

Because of the seriousness of the misconduct, the court ordered the parties to show cause why a two-year license suspension would not be appropriate sanction for it. In his response, Attorney Stein contended that the one-year suspension recommended by the referee is appropriate in light of the following: he cooperated with law enforcement and prosecutors pursuing his co-conspirators; he admitted his wrongdoing and cooperated with the Board of Attorneys Professional Responsibility; he has borne an "enormous weight" knowing for six years that he would be disciplined for his misconduct; he has led an exemplary professional life for 29 years; he has demonstrated genuine remorse and has been active in local civic organizations.

Notwithstanding those factors asserted in mitigation, the extreme seriousness of Attorney Stein's misconduct in this matter calls for more severe discipline

---

[1]SCR 20:8.4 provides:

**Misconduct**

It is professional misconduct for a lawyer to:

. . .

(c) engage in conduct involving dishonesty, fraud, deceit or misrepresentation.

than that recommended by the referee. We determine that a two-year license suspension is appropriate discipline for that misconduct.

IT IS ORDERED that the license of Martin R. Stein to practice law in Wisconsin is suspended for a period of two years, commencing September 1, 1992.

IT IS FURTHER ORDERED that within 60 days of the date of this order Martin R. Stein pay to the Board of Attorneys Professional Responsibility the costs of this disciplinary proceeding, provided that if the costs are not paid within the time specified and absent a showing to this court of his inability to pay the costs within that time, the license of Martin R. Stein to practice law in Wisconsin shall remain suspended until further order of the court.

IT IS FURTHER ORDERED that Martin R. Stein comply with the provisions of SCR 22.26 concerning the duties of a person whose license to practice law in Wisconsin has been suspended.

ABRAHAMSON, J., took no part.